STATE OF NEBRASKA, APPELLEE, v. DUANE FULLER,
APPELLANT.

281 N. W. 2d 749

Filed July 31, 1979. No. 42125.

Richard L. Schmeling, for appellant.

Paul L. Douglas, Attorney General, and Judy K.
Hoffman, for appellee.

BOSLAUGH, J.

The State has filed a motion for rehearing request-
ing that we reconsider our analysis concerning the
admissibility of the testimony of Clark concerning
statements made to him by the defendant while
Clark was equipped with a transmitter. Upon fur-
ther consideration we have concluded that our orig-
inal opinion holding the testimony was admissible
was in error.

At the time the statements were made, the defend-
ant was confined in prison as a result of having been
convicted and sentenced on other charges. Since
Clark was acting as a police agent, this was custo-
dial interrogation and the defendant was entitled to
the warnings required by Miranda v. Arizona, 384
U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694. See, Mathis
v. United States, 391 U. S. 1, 88 S. Ct. 1503, 20 L. Ed.

2d 381; Beatty v. United States, 377 F. 2d 181 (5th Cir., 1967), reversed, 389 U. S. 45, 88 S. Ct. 234; United States ex rel. Milani v. Pate, 425 F. 2d 6 (7th Cir., 1970); State v. Peters, 545 S. W. 2d 414 (Mo. App., 1976). Since the warnings were not given, the testimony of Clark as to the statements made by the defendant were inadmissible.

That part of our opinion in State v. Fuller, 203 Neb. 233, 278 N. W. 2d 756, which held the testimony admissible is withdrawn. The motion for rehearing is overruled.

MOTION FOR REHEARING OVERRULED.

CLINTON, J., dissenting.

I respectfully dissent from the holding of the supplemental opinion which makes inadmissible the testimony of the inmate Clark as to his conversations with the defendant Fuller. It is my view that the opinion of the United States Supreme Court in Mathis v. United States, *supra*, does not require such a result.

In Mathis, because the Miranda warnings had not been given, the court excluded evidence relating to violation of the income tax laws obtained by an agent of the Internal Revenue Service as a result of an interview of a defendant while he was incarcerated in the penitentiary on other charges. Miranda applies to in-custody interrogations by officers about matters which may tend to incriminate. Part of the rationale is that confinement, plus the official presence, tends to intimidate.

Neither Miranda nor Mathis involves the testimony of an informer. It surely cannot be contended that every time one inmate talks to another the Miranda warnings must be given. The fact that the informer in this case was acting for the investigators is irrelevant to the purpose of the Miranda rule where the intimidation of official presence is absent in a situation such as this where the defendant knows only that he is talking to a fellow prisoner.

Miranda defined custodial interrogation as follows: "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694. It is clear from the factual context of both Miranda and Mathis that it is the official presence in addition to confinement which brings the Miranda rule into play. In Miranda the court refers (in reaffirming Escobedo) to "rights which were put in jeopardy in that case through official overbearing." Miranda v. Arizona, *supra*, at p. 442. The court then engages in a lengthy discussion of "the nature and setting" of in-custody interrogation. Miranda v. Arizona, *supra,* at p. 445 et seq. The court winds up that discussion by referring to the "intimate connection between the privilege against self-incrimination and police custodial questioning." Miranda v. Arizona, *supra*, at p. 458. Later the court uses the term "informal compulsion exerted by law-enforcement officers during in-custody questioning." Miranda v. Arizona, *supra*, at p. 461.

United States Circuit Judge Henry J. Friendly, in an article entitled "The Fifth Amendment Tomorrow: The Case For Constitutional Change," 37 Uni. of Cincinnati L. Rev., p. 671, has characterized the Mathis decision as "the most inexplicable decision yet rendered in this area." Then in a footnote he adds the following: "The doctrinal evolution of this decision shows how the Court goes about its work of constantly expanding the privilege. The fifth amendment says that no person 'shall be *compelled* in any criminal case to be a witness against himself.' There is every reason to believe the framers meant just what they said; as the historian of the amendment has written: 'The element of compulsion or involuntariness was always an ingredient of the right and, before the right existed, of protests against incrimin-

nating interrogatories.' Levy 328. When, in Miranda v. Arizona, 384 U. S. 436 (1966), the Court prescribed warnings to be given persons being interrogated as to a crime for which they had been arrested, Chief Justice Warren was evidently concerned over this point; he met it by describing coercive techniques often employed by the police and then laying down a conclusive presumption: 'An individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion described above cannot be otherwise than under compulsion to speak.' *Id.* at 461. Whatever may be said of this in the context of a person who is being held in custody as the probable perpetrator of the crime as to which the police are interrogating him, and who may believe that he will continue to be held unless he talks, see H. Friendly, Benchmarks 272-73 (1967), the considerations in Miranda have no relevance to a person whose 'custody' consists of being a tenant in a state prison as a result of a conviction of an unrelated crime. Yet five Justices joined in an opinion characterizing these basic differences as 'minor and shadowy,' Mathis v. United States, 391 U. S. 1, 4 (1968), in the face of a dissent clearly pointing out that 'Miranda rested not on the mere fact of physical restriction but on a conclusion that coercion — pressure to answer questions — usually flows from a certain type of custody, police station interrogation of someone charged with or suspected of a crime.' *Id.* at 7. Predictably the majority's next step will be that since Mathis' custody did not, in the dissent's language, coerce him any more than 'the citizen interviewed at home by a revenue agent or interviewed in a Revenue Service office to which citizens are requested to come for interviews,' these too will be brought within the requirement for Miranda warnings. *Id.* See pp. 715-16 *infra.*"

Other courts have not, just because the person be-

ing interrogated is a prisoner, given to Mathis the per se custodial interrogation result which this court now does. In Cervantes v. Walker, 589 F. 2d 424 (9th Cir., 1978), the prisoner made such a contention. That court said: "To interpret Mathis as Cervantes urges would, in effect, create a per se rule that any investigatory questioning inside a prison requires Miranda warnings. Such a rule could totally disrupt prison administration. Miranda certainly does not dictate such a consequence. 'Our decision is not intended to hamper the traditional function of police officers in investigating crime. . . . General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding.' Miranda v. Arizona, *supra*, 384 U. S. at 477, 86 S. Ct. at 1629.

"Adoption of Cervantes' contention would not only be inconsistent with Miranda but would torture it to the illogical position of providing greater protection to a prisoner than to his nonimprisoned counterpart. We cannot believe the Supreme Court intended such a result. Thus, while Mathis may have narrowed the range of possible situations in which on-the-scene questioning may take place in a prison, we find in Mathis no express intent to eliminate such questioning entirely merely by virtue of the interviewee's prisoner status."

The Supreme Court of the United States, in Oregon v. Mathiason, 429 U. S. 492, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977), seems to make it clear that Miranda relates to interrogation by police or other officials. In that case they said: "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of

warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect."

The compulsion of official presence is absent in the case of interrogation by police informers. In the case before us, Clark and Fuller were alone when Fuller disclosed to Clark the full details of how air was injected into the victim's blood vessels. Furthermore, the general nature of what had occurred was already known by Clark from having been present during Gerheardt's earlier attempts to inject air into his bloodstream and from having information he obtained while present at the time of the acts which resulted in Gerheardt's death, when, although feigning sleep, he overheard what was happening although not actually seeing the events.

No cases have been cited in which the Miranda rule has been applied to information given by informants. See the annotation: Custodial Interrogation Within Rule of Miranda v. Arizona, 31 A. L. R. 3d 565. Interrogation by persons, other than police officers or in the presence of police officers or other officials, have almost uniformly been held to be noncustodial. 31 A. L. R. 3d 666 et seq.

The fact that Clark was in this case cooperating with the prosecutor and the investigating officers does not supply any factor of compulsion. As far as Fuller was concerned, the situation was not any different than if Clark were acting entirely on his own initiative and then later supplied the information to the prosecution.

In addition to Miranda and Mathis, the supplemental opinion cites: Beatty v. United States, 377 F. 2d 181, reversed, 389 U. S. 45, 88 S. Ct. 234; United States ex rel. Milani v. Pate, 425 F. 2d 6; State v. Peters, 545 S. W. 2d 414 (Mo. App., 1976). These cases are not at all in point and introduce into the opinion an element of confusion of principle. All

three cases involve statements taken after indictment and relate to the right of counsel under the Sixth Amendment and have as their base the holding of the United States Supreme Court in Massiah v. United States, 377 U. S. 201, 89 S. Ct. 1199, 12 L. Ed. 2d 246 (1964), that right to counsel attaches at the time of indictment or the filing of the complaint or information and that statements taken by officers or their agents, including informants, after that time, without presence and consent of counsel, are inadmissible without regard to whether the statements are voluntary. The original opinion of this court concedes that the right of counsel does not attach absolutely until judicial proceedings have been instituted. Brewer v. Williams, 430 U. S. 387, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977).

Miranda, on the other hand, has to do with the voluntariness of the statements as tested by the objective standard laid down in that case. Before indictment the right of counsel may be waived.

Mathis does not require the result reached by the court in this case because the alleged coercive effect of official presence was absent.

The rule announced in Mathis, even if one accepts it on its own facts, is, if it is to be interpreted by this court as embracing information obtained through informants prior to indictment, an unsound rule for it would require that in any investigation of a crime occurring in a penal institution Miranda warnings be given to every inmate interrogated, whether or not he is a suspect. Such a procedure would inevitably, in a large number of cases, make it impossible to get any information at all, for everyone questioned would immediately believe he is a suspect. Investigation of crimes committed in penitentiaries already must be difficult and this court should not place additional unwarranted procedural obstacles in the path. That is not in society's best interest. It is not in the best interest of the general welfare of penal

inmates for it places extreme obstacles in the way of the carrying out of the government's obligation to do what it can to protect inmates from violence inter se.

The probable effect of the court's ruling is to prevent prosecution of Fuller for the murder which he has admitted. Even worse, perhaps, is the obstacle which the opinion places in the way of appropriate and effective investigation of crimes committed in our penal institutions. The facts of the present case uniquely illustrate the problem. The felonious act occurred in the cell occupied by Gerheardt and three others. It was immediately apparent to the investigating authorities after the autopsy that if Gerheardt was murdered the other three occupants of the same cell were the prime suspects. They were also, as the only occupants of the cell, the probable witnesses. Only Clark gave information and later testified for the State. The information came only after he was assured of protection from the retribution which would be his as a "snitch."

I add one further explanatory item which is not properly part of this dissent, but an explanation of my view of the purport of the court's original opinion. The Attorney General, as indicated by the comments in his brief in support of the motion for rehearing, appears to have some difficulty in understanding that opinion even though the critical portion of it is printed in italics. The statement given by the defendant to the prosecutor was excluded because it was clearly induced by the misrepresentation made to Fuller to the effect that he could not give a mitigating statement to the prosecutor if he insisted on having counsel present at the interrogation. That, of course, simply was not true. The fact that the representation was made is not in dispute. Presence of counsel would not prevent the accused from making a statement. The effect of the misstatement was to induce Fuller not to exercise his right to counsel after he had already stated that he

desired to consult counsel. The statement made to the prosecutor was therefore not voluntary under the doctrine of Miranda.